**FILED**

1/28/2019

Clerk, U.S. District Court
District of Montana
Helena Division

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION

———————

| IN RE BUTTE SCHOOL DISTRICT NO. 1 | No. CV 14-60-BU-SEH |
|---|---|
| This document relates to all actions | **MEMORANDUM AND ORDER** |

**Table of Contents**

Introduction ..................................................................................................... 3

Factual Background ......................................................................................... 3

Procedural Background ................................................................................... 7

Legal Issue Background ................................................................................. 10

Standard of Review ....................................................................................... 12

Analysis ......................................................................................................... 13

I.      Procedural Claims ............................................................................... 14

   A.      Evaluation Procedures ................................................................... 15

      1.      Failure to assess for specific learning disabilities ............................. 16

      2.      Failure to review existing evaluation data ......................................... 19

      3.      Improper administration of evaluation tools ...................................... 20

      4.      Failure to conduct a proper functional behavioral analysis .............. 21

   B.      Behavioral Intervention Plan ......................................................... 23

   C.      Transition Services ......................................................................... 28

   D.      Parental Participation ..................................................................... 33

II.     Substantive Claim ................................................................................ 36

   A.      Standard ......................................................................................... 36

   B.      Application ..................................................................................... 38

Conclusion ..................................................................................................... 43

## Introduction

This matter is before the Court for merit disposition on the parties' cross-complaints[1] challenging a state hearing officer's administrative decision concerning whether Butte School District No. 1 ("District") provided Petitioner C.S. a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA").[2]

## Factual Background[3]

C.S. is a 24-year-old adult[4] with multiple disabilities, including Autism and Emotional Disturbance.[5] In September 2009, he enrolled in the District to attend public school as a student identified and educated as a child with a disability under the IDEA.[6] Between September 2009 and March 2012, C.S.'s natural mother, S.S.,

---

[1] Docs. 14 (Substitute Complaint/Petition Submitted to Replace Document No. 1 Filed on September 5, 2014 ("District's Complaint")) and 17 (Second Amended Complaint ("Petitioners' Complaint")).

[2] 20 U.S.C. § 1400–27 (2018).

[3] Findings of fact and conclusions of law set out and discussed in this memorandum are intended by the Court and are to be accepted as facts established on the record and, as appropriate, legal conclusions to be drawn from facts of record. Fact statements in this memorandum are to be considered as Fed. R. Civ. P. 52(a)(1) Findings of Fact.

[4] *See* Docs. 196 at 9 ("C.S. was born March 9, 1994") and 225 at 186:7–11 (stating that C.S. reached the age of majority on March 9, 2012).

[5] *See* Docs. 207-6 at 1 and 225 at 54:3–8.

[6] *See* Docs. 213-10 at 2 and 196 at 9.

participated as his parent in the development of his individualized education programs ("IEP").[7]

When C.S. reached 18 years of age on March 9, 2012,[8] all parental rights under the IDEA transferred to him under state law.[9] At this time, C.S. began living with his "direct service provider,"[10] Petitioner Stuart McCarvel ("McCarvel").[11] At no time has C.S. been declared incompetent, deemed a ward of the state, or appointed a guardian.[12] C.S.'s mother, S.S., ceased to have any role or participation in his education after he reached 18.[13]

On March 20, 2012, soon after moving in with McCarvel, C.S. stopped attending school.[14] He was disenrolled from the District on April 2, 2012,[15] briefly

---

[7] *See* Docs. 213-10 at 2 ("[C.S.'s] mother participated in all IEP meetings until March 2012"), 207-6 at 1 (IEP meeting on October 4, 2011), and 207-10 at 1 (IEP meeting on December 6, 2011). The record is devoid of any indication of parental participation by C.S.'s father at any time that C.S. was enrolled as a student in the District.

[8] *See* Docs. 196 at 9 and 225 at 186:7–11.

[9] *See* Mont. Admin. R. 10.16.3502 (2018). The hearing officer found that C.S. "held all parental rights afforded under the IDEA since March 9, 2012." Admin. Rec. No. 50 at p. 4.

[10] Doc. 225 at 184:20–22; *see also* Doc. 224 at 31:23–32:7.

[11] *See* Doc. 196 at 10.

[12] *See* Doc. 213-10 at 2, 4.

[13] *See* Doc. 227 at 47:8–12.

[14] *See* Doc. 196 at 10.

[15] *See* Doc. 196 at 10.

4

reenrolled in the District on April 13, 2012, but because of another prolonged absence, was disenrolled a second time.[16] He did not return to school for the remainder of the 2011–12 school year.[17]

On October 3, 2012, at the beginning of C.S.'s senior year of high school,[18] the District convened a meeting to develop a new IEP for C.S.[19] The IEP Team could not agree to a new IEP at this meeting.[20]

On November 26, 2012, the Montana Office of Public Instruction ("OPI") "received a Special Education Complaint" filed by McCarvel, alleging violations of the IDEA and "Montana special education laws."[21] In its final report on January 25, 2013, OPI directed the District to, among other things, "obtain appointment of a surrogate parent, or other judicial appointment for educational purposes," for C.S.[22] In compliance with this directive, on February 22, 2013, Mary Jo Mahoney was appointed by order of the Montana Second Judicial District Court, Silver Bow County, as surrogate parent for the purpose of representing C.S. in his educational

---

[16] *See* Doc. 196 at 11.

[17] *See* Doc. 196 at 11.

[18] *See* Doc. 213-10 at 2.

[19] *See* Docs. 196 at 11 and 207-17 at 1.

[20] *See* Docs. 196 at 11 and 213-10 at 7.

[21] Doc. 213-10 at 1–2.

[22] Doc. 213-10 at 11.

planning.[23] Mahoney continued to act in this court-appointed capacity through the rest of the 2012–13 school year.[24]

On April 18, 2013, the District held a meeting with C.S.'s IEP Team, including C.S. and McCarvel, to discuss C.S.'s future education plans.[25] Throughout the 2012–13 school year, C.S. had repeatedly told staff and his IEP Team that he wanted to graduate from school at the end of the year.[26] At the April 18 meeting, C.S. again voiced his desire to graduate.[27] The District offered and discussed both compensatory education and an extended school year as options for C.S.[28] He refused both offers and again stated his desire to graduate at the end of the school year and not return.[29] At this point in time, C.S. was an adult and had

---

[23] *See* Doc. 213-14 at 1.

[24] *See* Doc. 121-2 at 1–9. On February 14, 2018, the Court took judicial notice of "Order Relieving Mary Jo Mahoney as Surrogate, Appointing Stuart McCarval [*sic*] as Parent and Awarding Attorney Fees and Costs, *In the Matter of C.S.*, DN-13-4 (Mont. 2d Jud. Dist., Dec. 15, 2014)." Doc. 160 at 2.

[25] *See* Docs. 207-25 at 9 and 226 at 74:13–76:8, 180:2–19.

[26] *See* Docs. 207-22 at 9–10 and 226 at 74:13–76:8, 180:2–19.

[27] *See* Docs. 207-25 at 9 and 226 at 74:13–76:8, 180:2–19.

[28] *See* Docs. 207-25 at 9 and 226 at 74:13–76:8, 180:2–19.

[29] *See* Docs. 207-25 at 9 and 226 at 74:13–76:8, 180:2–19.

not been found incompetent or appointed a guardian.[30] C.S.'s decision to discontinue further school attendance was accepted.[31] He graduated in June 2013.[32]

## Procedural Background

On October 3, 2013, C.S. and McCarvel (collectively "Petitioners"), filed a due process complaint with OPI against the District alleging both procedural and substantive violations of the IDEA during the 2011–12 and 2012–13 school years.[33] Petitioners sought payment from the District for costs of compensatory education services, and for other relief.[34] On June 10, 2014, after a three-day administrative due process hearing,[35] the hearing officer issued an administrative decision, concluding that the District met the IDEA's FAPE requirement in the

---

[30] *See* Doc. 213-10 at 2, 4.

[31] *See* Doc. 207-25 at 9.

[32] *See* Docs. 196 at 9 and 207-25 at 9.

[33] *See* Admin. Rec. No. 1 at pp. 1–8 (Request for Due Process Hearing Under the Individuals with Disabilities Education Act). During this time, C.S. was educated under two IEPs: the IEP developed on October 4, 2011 ("2011 IEP"), which was in effect until February 27, 2013, at which time the IEP developed on October 3, 2012 ("2013 IEP"), was approved and adopted. *See* Docs. 207-6 at 1, 207-17 at 7, 207-19 at 9, 207-22 at 9, and 227 at 51:15–52:15; Transcript of Proceedings, Before the State Superintendent of Public Instruction, Denise Juneau, State of Montana ("Admin. Hrg. Tr.") at 388. The District held several IEP meetings to develop a new IEP for the 2012–13 school year, but one was not approved until February 27, 2013. *See* Docs. 207-17 at 7, 207-19 at 9, 207-22 at 9, and 227 at 51:15–52:15; Admin. Hrg. Tr. at 388. The IEP Teams for the 2011 and 2013 IEPs included McCarvel and C.S. *See* Docs. 207-6 at 7, 207-17 at 7, and 207-22 at 10.

[34] *See* Admin. Rec. No. 1 at pp. 8–9.

[35] *See* Admin. Hrg. Tr. at 1, 224, and 423.

7

2012–13 school year, but had failed to provide a FAPE during the 2011–12 school year.[36] The District was ordered to provide specific compensatory educational services to C.S. at its own expense.[37]

Separate complaints were filed in this Court challenging portions of the hearing officer's administrative decision on September 5, 2014.[38] The actions were consolidated on January 22, 2015.[39]

On February 5, 2016, a hearing was held to address, *inter alia*, the parties' requests to supplement the administrative record.[40] At that hearing, the Court, after reviewing the record and finding that Petitioners' expert witness was not qualified to render opinions or make recommendations to serve as a basis for the hearing officer's administrative decision, set aside the recommendations and opinions made at the administrative due process hearing.[41] Accordingly, the Court ordered that an evidentiary hearing be held to receive additional testimony and evidence to

---

[36] *See* Admin. Rec. No. 50 at pp. 35–36.

[37] *See* Admin. Rec. No. at pp. 42–43.

[38] Doc. 1 (Complaint/Petition for District Court Review and Relief From Those Findings of Fact, Conclusions of Law and Order Dated June 10, 2014); Doc. 1, Case. No. CV 14–61–BU–SEH (Petitioners' Complaint).

[39] *See* Doc. 10 at 1–2.

[40] *See* Doc. 98 at 3:18–4:4.

[41] *See* Doc. 98 at 26:6–33:22.

8

supplement the administrative record in the interest of conducting an independent and thorough review of the case before it.[42]

A four-day evidentiary hearing was conducted in October 2018[43] directed to issues related to whether the District provided C.S. with a FAPE during the 2011–12 and 2012–13 school years.[44] Post-hearing proposed findings of fact and conclusions of law, briefs, and proposed forms of judgment were filed on December 17, 2018.[45] The matter is ripe for merit decision.

---

[42] *See* Doc. 98 at 35:2–39:12.

[43] The case was briefly stayed pending the United States Supreme Court's decision in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 798 F.3d 1329 (10th Cir. 2015), *cert. granted* (Sept. 29, 2016) (No. 15-827). *See* Doc. 124 at 1–2.

[44] A part of the particularly unique challenges presented by the case were addressed with counsel pre-hearing on March 13, 2018:

> I encourage Counsel, by all of these comments, to place upon you, as the lawyers involved, having an affirmative role to assist this Court in coming to a resolution of this case. A strict adversarial approach, each side drawing a line in the sand and saying, "We will go this far and no further," will not, in the view of the Court, help us to a collective acceptable resolution of this case.
>
> This requires something more. It requires something different. It requires affirmative assistance to the Court, which goes beyond the traditional adversarial roles with which this Court [h]as worked for the last 50 years. That is not good enough for this case. And in the view of the Court, the pronouncements of the United States Supreme Court, and the legislation that is before us that we are to work with, requires something more, better, and different, and I encourage you to have that in mind as we go forward.

Doc. 169 at 13:6–21.

[45] *See* Docs. 252, 253, 254, and 256. Proposed findings of fact and conclusions of law of extraordinary length, complexity, and detail were submitted post-hearing encompassing over 162 pages of findings and conclusions and over 181 pages of appendices and supporting briefs.

9

## Legal Issue Background

Notwithstanding the extended procedural history of these claims and the unusual complexity of the factual and legal issues presented under state and federal law, the core question presented remains—did the District provide C.S. with a FAPE required by IDEA?

"The IDEA's 'primary goal'"[46] is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."[47] A FAPE is to be uniquely tailored to the needs of a student with a

Unfortunately, the submitted materials were, in many instances, argumentative, highly editorialized in form and content, and of limited substantive assistance to the Court in fashioning factual findings and stating legal conclusions on relevant issues.

[46] *M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) ("*Antelope Valley*") (quoting *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010)).

[47] 20 U.S.C. § 1400(d)(1)(A) (2018). "Special education" is defined as "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29) (2018). "Related services" is defined as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26).

10

disability by an IEP,[48] which is "'the centerpiece of the [IDEA's] education delivery system.'"[49]

An IEP is a comprehensive education plan collaboratively developed "in compliance with a detailed set of procedures" by a student's "IEP Team",[50] including teachers, school officials, the child's parents, and, "whenever appropriate, the child with a disability."[51] "An IEP must contain, among other things, 'a statement of the child's present levels of academic achievement,' 'a statement of measurable annual goals,' and 'a statement of the special education and related services . . . to be provided to the child.'"[52] An IEP must also include "appropriate measurable postsecondary goals based upon age appropriate transition assessments," and "the transition services . . . needed to assist the child in reaching those goals" if the student is sixteen years old or older.[53]

---

[48] *See Antelope Valley*, 858 F.3d at 1194 (citations omitted).

[49] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

[50] *Endrew*, 137 S. Ct. at 994 (citation omitted).

[51] 20 U.S.C. § 1414(d)(1)(B) (2018).

[52] *Antelope Valley*, 858 F.3d at 1194 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)).

[53] 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).

11

"[A] school district 'must comply both procedurally and substantively with the IDEA'" to meets its obligation to provide a student with a FAPE.[54] A court "must inquire first into whether the district complied with the IDEA's procedural requirements,"[55] and then, whether the district met "its substantive obligation under the IDEA" by offering "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances,"[56] when determining whether a school district provided a FAPE.

## Standard of Review

The Court applies a "modified *de novo*" standard of review.[57] In reviewing the hearing officer's administration decision under the IDEA, it may "accord some deference to the ALJ's factual findings" if "they are 'thorough and careful,'" but the degree of deference to be given is within the Court's discretion.[58] "The IDEA itself allows federal courts to receive evidence in addition to that put forth at the

---

[54] *Antelope Valley*, 858 F.3d at 1194 (citations omitted).

[55] *Forest Grove Sch. Dist. v. Student*, 665 F. App'x 612, 614 (9th Cir. 2016) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206–07 (1982)).

[56] *Endrew*, 137 S. Ct. at 999.

[57] *See, e.g., S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (following the Fourth, Sixth, and Tenth Circuits' modified *de novo* standard of review) (citations omitted); *see also Seattle School Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996) ("The Ninth Circuit has interpreted [20 U.S.C. § 1415(e)(2)] as calling for de novo review.").

[58] *Antelope Valley*, 858 F.3d at 1194 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).

12

administrative hearing, and to weigh this additional evidence equally."[59] The Court makes "its own factual determinations . . . on a preponderance of the evidence."[60] The burden of proof upon review is "on the party challenging the administrative ruling."[61]

## Analysis

Petitioners have adopted a "see what sticks" approach to the case. They allege the District committed a host of procedural violations that denied C.S. a FAPE during the 2011–12 and 2012–13 school years. They also assert that during these two school years, the District failed to meet its substantive obligation to provide C.S. with an IEP that was reasonably calculated to enable him to progress appropriate in light of his circumstances.

Petitioners' overarching request that compensatory education be granted upon a finding that the District violated the IDEA stands on unsolid ground. In the spring of 2013, C.S. was an adult.[62] He repeatedly and unequivocally declared that he did not want to return to school, and he previously had refused the option of

---

[59] *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1126 (9th Cir. 2003) ("*Vashon Island*") (citing 20 U.S.C. § 1415(e)(2) (1990)), *superseded by statute on other grounds*, 20 U.S.C. § 1414(d)(1)(B).

[60] *Vashon Island*, 337 F.3d at 1127 (citations omitted).

[61] *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994) (citations omitted) *superseded by statute on other grounds*, 20 U.S.C. § 1414(d)(1)(B).

[62] *See* Docs. 196 at 9 and 225 at 186:7–11.

13

compensatory education.[63] The Court is without either the power or the prerogative to order a 24-year-old adult to be subjected to, to attend, or to participate in an offered and available compensatory education program against his will. Nor does the Court find that it has the capacity or justification to appoint a third party to make that decision on the student's behalf and against his will. Nevertheless, the Court will address the merits of each claim below.

## I. Procedural Claims

"The IDEA contains numerous procedural safeguards[ ]designed to protect the rights of disabled children and their parents."[64] "Congress placed every bit as much emphasis upon compliance with [the IDEA's] procedures . . . as it did upon the measurement of the resulting IEP against a substantive standard."[65]

"Procedural flaws do not automatically require a finding of a denial of a FAPE," however.[66] To find that a student was denied a FAPE based on a procedural defect, the Court must determine that the procedural violation either: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parent's

---

[63] *See* Docs. 207-22 at 9–10, 207-25 at 9, and 226 at and 226 at 74:13–76:8, 180:2–19.

[64] *Antelope Valley*, 858 F.3d at 1195 (citing 20 U.S.C. § 1415).

[65] *Rowley*, 458 U.S. at 205 (citation omitted).

[66] *W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23, Missoula, Mont.*, 960 F.2d 1479, 1484 (9th Cir. 1992) *superseded by statute on other* grounds, 20 USC § 1414(d)(1)(B).

14

opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parent's child; or (III) caused a deprivation of educational benefit."[67]

Petitioners claim the District denied C.S. a FAPE by: (A) violating various evaluation procedures; (B) failing to develop and implement an appropriate behavioral intervention plan; (C) failing to provide appropriate transition services, post-secondary goals, and transition assessments; and (D) violating procedures that protect the right to parental participation.[68] Each alleged violation will be addressed.

## A.   Evaluation Procedures

The IDEA requires that a school district conduct a reevaluation of a student with a disability at least every three years to determine the student's eligibility for special education.[69] In doing so, a school district must comply with an extensive set of procedures provided under 34 C.F.R. §§ 300.304–300.311. Here, Petitioners claim the District's reevaluations of C.S. were procedurally inadequate because: (1) it did not assess C.S. for specific learning disabilities; (2) it failed to include existing evaluation data; (3) it did not administer evaluation tools in compliance

---

[67] 20 U.S.C. § 1415(f)(3)(E)(ii) (2018); *see also* 34 C.F.R. § 300.513(a)(2)(i)–(iii) (2018).

[68] *See* Doc. 17 at 7–14.

[69] *See* 20 U.S.C. § 1414(a)(2) (2018); *see also* 34 C.F.R. § 300.303 (2018).

with standard protocol; and (4) its functional behavioral analysis of C.S. was not sufficiently comprehensive.

### 1. Failure to assess for specific learning disabilities

Petitioners first claim the District erred when it failed to identify C.S. as a student with a specific learning disability.[70] The IDEA requires a student to be assessed "in all areas related to the suspected disability" when reevaluated.[71] It is alleged that the District suspected C.S. had specific learning disabilities in math, reading, and written expression,[72] but failed to formally assess him for those disabilities during its reevaluations in March 2011, October 2011, and April 2013.[73]

Whether or not the District suspected C.S. had specific learning disabilities—there being evidence suggesting skepticism of such disabilities among the District's personnel[74]—it was required to first "request parental consent to

---

[70] *See* Docs. 17 at 9 and 196 at 4.

[71] 34 C.F.R. § 300.304(c)(4).

[72] The Petitioners point to the psycho-educational assessment conducted by the District's school psychologist between January 20, 2011, and February 25, 2011, wherein she opined that C.S. "might be considered as qualifying for a specific learning disability since a significant discrepancy exists between his cognitive abilities and his academic achievement; however, C.S.'s behaviors may be affecting his academic achievement." Doc. 207-1 at 5.

[73] *See* Doc. 17 at 8–9, 14.

[74] The record reflects substantial support for the District's suspicion that C.S.'s academic achievement was being affected by his behavior rather than any specific learning disability. *See* Docs. 207-1 at 5 ("[A] significant discrepancy exists between [C.S.'s] cognitive abilities and his

evaluate"[75] C.S. before "[d]etermining the existence of a specific learning disability."[76] Although parental consent was sought, the District never received the required parental consent to assess C.S. for specific learning disabilities.[77]

The evaluation team discussed with C.S.'s mother and parental participant, S.S.,[78] whether the team should formally assess C.S. as a student with a specific learning disability during a reevaluation meeting on March 21, 2011.[79] S.S. made clear that she did not want her son identified under this disability category, but agreed that he should continue to receive services in the academic areas of math,

---

academic achievement; however, [C.S.'s] behaviors may be affecting his academic achievement."), 207-5 at 1 ("Academic performance – greatly impeded by his increase in aggressive & defiant behaviors."), 207-24 at 3 ("[C.S.] continues to frequently demonstrate behaviors associated with autism to a sufficient degree that those behaviors appear to impede his school success"), and 207-24 at 4 ("His success would not be adversely affected by his intellectual ability, but rather by his total disengagement from learning.").

[75] 34 C.F.R. § 300.309(c) (2018).

[76] This phrase appears in 34 C.F.R. § 300.309's title. *See Carter v. United States*, 530 U.S. 255, 267 (2000) (expressing the general rule that "the title of a statute" is relevant when it "'sheds light on some ambiguous word or phrase'") (quoting *Pa. Dep't of Corr. v. Yeskey*, 254 U.S. 206, 212 (1998)) (quotation marks and modifications omitted).

[77] *See* Doc. 226 at 114:13–115:21, 214:23–115:6.

[78] *See* Doc. 225 at 185:8–13.

[79] *See* Doc. 226 at 114:13–115:21, 214:23–115:6.

reading, and written expression.[80] The District honored the parental participant

mother's decision.[81] It did not violate 34 C.F.R. § 300.304(c)(4).

In any event, the District's course of action in compliance with parental

participation instructions did not impede the provision of FAPE or deprive C.S. of

educational benefit. On the contrary, C.S. was provided more than 4 hours per

week of special education instruction and services in math, reading, and written

expression throughout the 2011–12 and 2012–13 school years.[82] Moreover, the IEP

Teams, the evaluation teams, and the District's school psychologist all indicated

that C.S.'s academic achievement was being adversely affected by his behavior

and his disengagement from educational instruction.[83]

---

[80] *See* Doc. 226 at 114:13–115:21, 214:23–115:6.

[81] *See* Doc. 226 at 114:13–115:21, 214:23–115:6.

[82] *See* Docs. 207-6 at 5, 207-22 at 7, and 226 at 113:9–16. The District employed a wide array of instructional methods to address C.S.'s academic deficiencies in math, reading, and written expression, including the "Adventures in Language" curriculum, "Everyday Mathematics", "Success Maker", "STAR Math", "Accelerated Math", the "Reading Mastery" curriculum, computer-based programs, concept mapping, picture descriptions, chunking, peer modeling, and peer tutoring. *See* Doc. 226 at 60:6–20.

[83] *See* Docs. 207-1 at 5 ("[A] significant discrepancy exists between [C.S.'s] cognitive abilities and his academic achievement; however, [C.S.'s] behaviors may be affecting his academic achievement."), 207-5 at 1 ("Academic performance – greatly impeded by his increase in aggressive & defiant behaviors."), 207-24 at 3 ("[C.S.] continues to frequently demonstrate behaviors associated with autism to a sufficient degree that those behaviors appear to impede his school success"), and 207-24 at 4 ("His success would not be adversely affected by his intellectual ability, but rather by his total disengagement from learning.").

18

## 2. Failure to review existing evaluation data

Petitioners next argue that the District's reevaluation of C.S. violated 34 C.F.R. § 300.305(a)(1) by failing to "[r]eview existing evaluation data,"[84] namely, "academic achievement standard scores."[85]

Petitioners are patently incorrect in argument directed to the District's review of academic achievement standard scores. The March 2011 Evaluation Report listed C.S.'s standard scores on the Woodcock-Johnson Tests of Achievement III ("WJIII") administered on February 25, 2011—63 on Broad Reading, 58 on Written Expression, 61 on Calculation, and 73 on Applied Problems.[86] The April 2013 Evaluation Report similarly lists "grade equivalent scores" for the WJIII administered on January 22, 2013: "Reading Fluency 2.0; Calculation 3.8; Spelling 3.1; Writing Fluency 3.3; Passage Comprehension 4.5; Applied Problems 4.8."[87] The record is clear the District reviewed C.S.'s academic achievement standard scores.

---

[84] Petitioners impermissibly attempt to raise arguments pertaining to the review of existing evaluation data based on documents not in the record. *See* Doc. 254 at 17 (citing Doc. 249-6 at 2–4, 6–11, and 20–29).

[85] *See* Doc. 254 at 16–27, 90.

[86] *See* Doc. 207-2 at 3.

[87] Doc. 207-24 at 3.

The District's review of academic achievement standard scores did not violate FAPE or deprive C.S. of educational benefit. The 2011 and 2013 IEPs discussed C.S.'s present levels of academic achievement in math, reading, and written expression based on, among other things, standard assessments (i.e. STAR Math and STAR Reading standard scores were listed).[88] The 2011 IEP also provided measurable annual goals and special education services to improve C.S.'s performance in these academic areas.[89]

Petitioners do not provide any evidence that existing evaluation data was disregarded by the District, or that the District's review of evaluation data impeded FAPE or deprived C.S. of educational benefit. Therefore, their claim fails for lack of proof.

### 3. Improper administration of evaluation tools

Petitioners also assert that two evaluation tools—the Social Skills Improvement System ("SSIS") and the Behavior Assessment System for Children-Second Edition ("BASC-II")—were not administered "in compliance with standard protocols."[90] Petitioners are mistaken.

---

[88] *See* Docs. 207-6 at 4, 207-22 at 5, and 226 at 128:11–129:11.

[89] *See* Doc. 207-6 at 1, 3–5.

[90] The Petitioners base their argument entirely on the following expert testimony of Dr. Brenda Roche:

20

Under 34 C.F.R. § 300.304(c)(1)(v), a school district must ensure that materials used in reevaluating a child "[a]re administered in accordance with any instructions provided by the producer of the assessments." No evidence was offered or admitted that the District failed to follow instructions provided by the producers of the SSIS and the BASC-II. The District did not violate 34 C.F.R. § 300.304(c)(1)(v).

### 4. Failure to conduct a proper functional behavioral analysis

Petitioners further argue that the District's "functional behavioral analysis" ("FBA") violated various IDEA evaluation procedures.[91] Again, Petitioners misread the law.

An FBA is not an "evaluation" for purposes of the IDEA's evaluation procedures. The IDEA defines "evaluation" as "procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and

---

> On the [SSIS], while she did have one particular teacher complete it, we would usually at this age want more than one to complete that, so we have a cross-section of looking at behaviors, across different teachers.
>
> On the [BASC-II], again, it would have been nice to have more than one teacher, as well as there is a self-report measure that would have been good to have [C.S.] complete, as well.

Doc. 224 at 83:1–10.

[91] *See* Doc. 254 at 96–97.

the nature and extent of the special education and related services that the child needs."[92]

Reevaluations conducted in compliance with 34 C.F.R. §§ 300.304–300.311 are concerned with determining "[w]hether the child is a child with a disability"[93] and "[t]he content of the child's IEP."[94] Reevaluations must: (1) be "sufficiently comprehensive to identify all of the child's special education and related services needs"[95]; (2) use multiple measures and assessments to determine eligibility;[96] and (3) assess children "in all areas related to the suspected disability."[97]

Petitioners assert that an FBA is "an empirical process of evaluating the function of a child's behavior in order 'to provide the IEP team with additional information, analysis, and strategies for dealing with undesirable behavior, especially when it is interfering with a child's education.'"[98] They further assert

---

[92] 34 C.F.R. § 300.15 (2018).

[93] 34 C.F.R. § 300.304(b)(1)(i) (2018).

[94] 34 C.F.R. § 300.304(b)(1)(ii).

[95] 34 C.F.R. § 300.304(c)(6).

[96] *See* 34 C.F.R. § 300.304(b)(2).

[97] 34 C.F.R. § 300.304(c)(4) ("[I]ncluding, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities.").

[98] Doc. 254 at 94 (quoting *Indep, Sch. Dist. No. 2310*, 29 IDELR 330 (Minn. SEA Nov. 2, 1998)).

22

that the "purpose" of an FBA "is to identify the reason for [a problem] behavior," and "to dissect the behavior so as to plan the most effective method of eliminating it."[99]

Petitioners' definition of an FBA falls outside the scope of an IDEA evaluation. An FBA is neither designed nor intended to be used for the purpose of comprehensively determining: (1) whether the child is one with a disability; or (2) the content of the child's IEP. By its very definition, an FBA is concerned only with a child's behavior. A reevaluation conducted pursuant to 34 C.F.R. §§ 300.304–300.311, on the other hand, is concerned with far more, including a child's intelligence, academic performance, and physical ability. The District did not violate the IDEA's evaluation procedures in conducting an FBA.

## B.  Behavioral Intervention Plan

Petitioners next claim that the District's failure to "conduct appropriate functional behavior assessments" ("FBA")[100] and develop "appropriate, individualized behavioral intervention plans" denied C.S. a FAPE during the

---

[99] Doc. 254 at 35, 95.

[100] Doc. 17 at 20.

23

2011–12 and 2012–13 school years.[101] This statement manifests an "egregious misunderstanding of the IDEA's requirements."[102]

The IDEA does not include an across-the-board requirement that an FBA be conducted[103] or that an IEP include a behavior intervention plan.[104] It only directs an IEP Team to "*consider* the use of positive behavioral interventions and supports, and other strategies, to address" behaviors that impede a "child's learning or that of others."[105] Additionally, if a student has disability-related behavioral needs, an IEP must include "measurable annual goals" developed to "enable the child to be involved in and make progress in the general education curriculum,"[106] and how "progress toward meeting the annual goals . . . will be measured."[107]

---

[101] Doc. 17 at 13.

[102] *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 25 (1st Cir. 2008).

[103] See *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251–52 (3d Cir. 2012) ("[T]he failure to employ a functional behavioral assessment . . . is [not] per se indicative of an inappropriate evaluation."). A child with a disability is only required to receive an FBA under the IDEA where he is removed from his current placement. 20 U.S.C. § 1415(k)(1)(D)(ii) (2018).

[104] *See Lessard*, 518 F.3d at 25–26; *see also Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 426 (8th Cir. 2010); *Sch. Bd. of Indep. Sch. Dist. No. 11 v. Renollett*, 440 F.3d 1007, 1011 (8th Cir. 2006).

[105] 34 C.F.R. § 300.324(a)(2)(i) (2018) (emphasis added).

[106] 34 C.F.R. § 300.320(a)(2)(i) (2018).

[107] 34 C.F.R. § 300.320(a)(3)(i).

24

The District met IDEA requirements in both the 2011–12 and 2012–13 school years. The 2011 IEP included a measurable annual goal that C.S. would "follow directions when asked 4 out of 5 times with out [*sic*] acting out as measured by teacher observation and recording."[108] This goal was developed to address C.S.'s need "to be able to follow directions when asked without getting angry and making rude comments,"[109] which the IEP Team determined was adversely affecting his educational progress.[110]

On April 20, 2012, a "Behavior Plan" was developed and later attached to the 2011 IEP.[111] It set a measurable goal that C.S. would "use appropriate behaviors 80% of the time"[112] and replace "inappropriate verbal and physical aggression towards peers and staff" with journaling or communicating with staff that he needs a break.[113] The Behavior Plan also outlined the methods of instructing the replacement behavior, accommodations, interventions, the methods

---

[108] Doc. 207-6 at 4.

[109] Doc. 207-6 at 4.

[110] Doc. 207-6 at 5. The hearing officer erroneously found that "the School District did not document in C.S.'s IEPs that his behavior impeded learning until the 2012 annual IEP meeting . . . ." Admin. Rec. No. 50 at p. 9. The 2011 IEP noted that C.S.'s behaviors impeded his learning in the "Least Restrictive Environment" section. *See* Doc. 207-6 at 5.

[111] Doc. 207-12 at 11–12.

[112] Doc. 207-12 at 12.

[113] Doc. 207-12 at 11.

25

of measuring progress, and the positive and negative consequences for appropriate and inappropriate behavior.[114] A similar Behavior Plan was developed on October 3, 2012, and later attached to the 2013 IEP.[115]

The 2013 IEP provided two behavior-related annual measurable goals that C.S. would "use appropriate language and respect personal space and boundaries 4 out of 5 times in school and social situations" and "keep[ ]his hands to himself and use appropriate social interactions 80% of the time."[116] Such goals were also to be "measured by teacher observation and recording."[117]

On December 18, 2012, the District conducted a behavioral assessment of C.S., which described behaviors impeding C.S.'s educational progress and the frequency, intensity, antecedents, consequences, and the suspected functions of these behaviors.[118] Several strategies for addressing C.S.'s problem behaviors were suggested.[119]

---

[114] *See* Doc. 207-12 at 11–12.

[115] *See* Doc. 207-17 at 8–9.

[116] Doc. 207-22 at 6.

[117] Doc. 207-22 at 6.

[118] *See* Doc. 207-20 at 1–2.

[119] *See* Doc. 207-20 at 2.

In sum, the record is replete with evidence of the District's efforts to address the impacts of C.S.'s behavior in his educational program. His behavioral, emotional, and social issues were a primary focus of the 2011 IEP[120] and 2013 IEP,[121] three reevaluations and evaluation reports,[122] one psycho-educational assessment,[123] two Behavioral Plans,[124] an administration of the BASC-II and SSIS,[125] and multiple periods of daily behavioral observations and analysis.[126] C.S.'s IEPs created measurable annual goals and specialized instruction to address his behavioral, emotional, and social needs.[127] The IEPs also provided that C.S. would be instructed in "small group's [*sic*] within a restrictive environment"[128] and given time and a "safe space" to be alone when needed.[129] The record is clear that the District considered the use of positive behavioral interventions and

---

[120] *See* Doc. 207-6 at 4.

[121] *See* Doc. 207-22 at 6.

[122] *See* Docs. 207-2 at 1–6, 207-5 at 1–6, and 207-24 at 1–15.

[123] *See* Doc. 207-1 at 1–5.

[124] *See* Docs. 207-12 at 11–12 and 207-17 at 8–9.

[125] *See* Doc. 207-1 at 3–4.

[126] *See* Docs. 207-4 at 1–7, 207-8 at 1–54, 207-12 at 13–16, and 207-29 at 1–90.

[127] *See* Docs. 207-6 at 4 and 207-22 at 6.

[128] Doc. 207-6 at 5.

[129] Doc. 226 at 124:3–125:3; *see also* Doc. 207-6 at 6 and 207-22 at 7–8.

supports to address behaviors that impeded C.S.'s educational progress, developed

measurable annual and short-term behavioral goals in C.S.'s IEPs, and provided

the methods by which these goals were measured.[130] The Petitioners' claim fails

for lack of proof.

## C. Transition Services

The IDEA requires for a student sixteen years old or older that an IEP

include transition services "needed to assist the child in reaching"[131] "appropriate

measurable postsecondary goals based upon age appropriate transition

assessments."[132] Petitioners claim that the District failed to meet these

---

[130] The hearing officer's determination that "C.S. was deprived of educational opportunities and his right to FAPE was impeded" was based in part on a finding that the District "disregarded the document fact that C.S.'s behaviors impeded his learning" and "the IEP team did not document that they considered positive behavioral supports" at the October 4, 2011, IEP meeting. Admin. Rec. No. 50 at 32. This finding is against the evidence. The 2011 IEP states that C.S.'s behaviors impeded his learning in the "Least Restrictive Environment" section. *See* Doc. 207-6 at 5. More importantly, the record, as reflected above, shows the many ways in which the District used interventions and supports to address C.S.'s behavioral issues and their impediments to his educational progress.

[131] 34 C.F.R. § 300.320(b)(2) (2018). "Transition services" is defined as "a coordinated set of activities," 34 C.F.R. § 300.43(a), "based on the individual child's needs," 34 C.F.R. § 300.43(a)(2), and designed to "facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation." 34 C.F.R. § 300.43(a)(1).

[132] 34 C.F.R. § 300.320(b)(1).

requirements during the 2011–12 and 2012–13 school years.[133] The record demonstrates otherwise.

First, the District conducted age-appropriate transition assessments for C.S. The Interest Determination, Exploration and Assessment System ("IDEAS"), a career interest inventory available within the Montana Career Information System ("MCIS"), was administered.[134] The IDEAS survey taxonomized and charted C.S.'s responses into several different interest areas (i.e. Mechanical Fixing, Medicine, Creative Arts, Public Speaking, etc.) based on C.S.'s interest levels in those areas.[135] Additionally, C.S. was given a "Career Cluster Survey", by which he expressed his interests in certain activities, personal qualities, and school subjects.[136] MCIS created for the District and C.S. included: (1) a "Career Cluster Inventory" that provided numerical values to different occupations based on C.S.'s answers; (2) a "Summary of Selected Skills" that ranked what skills C.S. found most satisfying; (3) categorization of "Holland Personality Types" (i.e. Social, Artistic, Enterprising, etc.) and descriptions of each personality type; (4)

---

[133] *See* Doc. 17 at 11–12.

[134] *See* Docs. 213-19 at 1–3 and 225 at 92:17–23. According to the Petitioners' expert witness, the MCIS is a system provided by OPI to help identify students' career interests, aptitudes, and attitudes, as well as to enable students to create a career interest portfolio. Doc. 225 at 90:12–91:2.

[135] *See* Doc. 213-19 at 2–3.

[136] *See* Doc. 207-16 at 8–11.

"Occupational Clusters" that matched skills to "Montana Career Fields"; and (5) a list of the "Top 30 Occupations" based on C.S.'s skill preferences.[137] The MCIS assessments identified above were administered by the District in addition to interviewing C.S. about his career interests as a form of informal transition assessment.[138]

The District developed appropriate measurable post-secondary goals for C.S. based on the formal and informal transition assessments. The 2011 IEP provided three post-secondary goals: (1) "[C.S.] will determine which educational program/training will be right from [*sic*] him within 3 months of graduation"; (2) "[C.S.'s] adult placement will help set up his employment within 3 months of graduation"; and (3) "[C.S.'s] living skills will be self-determined by his assistance team[ and C.S.] will choose his adult services within 1 month of graduation."[139] These post-secondary goals were both measurable—an observer will know

[137] *See* Doc. 207-16 at 1–7.

[138] *See* Docs. 207-6 at 2 and 207-22 at 3.

[139] Doc. 207-6 at 2. The hearing officer found that these post-secondary goals were "not goals for C.S. to achieve, but rather statements postponing the setting up of goals or identifying goals for outside adult providers to achieve." Admin. Rec. No. 50 at 17. But reliance on "hindsight to second-guess an educational program that was reasonable at the time" is impermissible. *K.D. by and through Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018) ("*Downingtown*") (citing *Endrew*, 137 S. Ct. at 1001–02). In October 2011, C.S. did not know what he wanted to do after graduation and he did not want to work. *See* Doc. 207-6 at 2. Setting a goal for C.S. to set up employment and determine what training programs he would be involved in after graduation are appropriate and measurable goals for a 17-year-old student who is uncertain about his future plans. *See* Doc. 207-6 at 1.

whether C.S. determined his educational program/training within 3 months of graduation, for example—and appropriate, in light of the fact that the only feedback the District received from C.S. at this time regarding his desired post-school activities was that he did not "want to work or have any idea what he might like to do."[140]

The 2013 IEP provided three different post-secondary goals: (1) "[C.S.] will continue to work with family outreach and stuart [*sic*] to continue to develop skills necessary for life beyond school"; (2) "[C.S.] will work with vocrehab and family outreach find [*sic*] a job within 6 months of graduation[ and] will work with the school, stuart [*sic*], family outreach and vocrehab to pursue job opportunities and skill building"; and (3) "[C.S.] will be able to effectively cook, clean, count money and do his own laundry with support from school, stuart [*sic*], and family outreach."[141] The post-secondary goals were based on C.S.'s desire for continued aid from service providers, to find a job, and to live independently.[142] They were also measurable and appropriate under the circumstances.

The District provided a panoply of transition services throughout the 2011–12 and 2012–13 school years that focused on employment, training, independent

[140] Doc. 207-6 at 2.

[141] Doc. 207-22 at 3.

[142] *See* Doc. 207-22 at 3.

living, social, and community participation, along with appropriate measurable

post-secondary goals developed for C.S. Included were: job training in the student

store, intended to help C.S. learn how to work with money and develop customer

service skills; instruction in and use of public transportation; grocery shopping;

cooking; laundry; community service projects, such as building a Christmas

display for a school; volunteer work, such as making blankets for St. James

Hospital to use in the nursery and folding clothes at the clothing drive; swimming

at the public pool, to help teach C.S. self-care practices, how to exercise, and social

skills; personal fitness at the gym; setting up and tearing down school events and

helping the custodian (teaching C.S. how to follow instructions and develop basic

work skills); daily life skills instruction; attending the Career Fair; and

collaboration with service providers, including Vocational Rehabilitation, Helena

Industries, Job Corps, Youth Challenge, Altacare, and AWARE.[143] Petitioners'

argument that the District failed to provide C.S. with transition services to assist

him in reaching his post-secondary goals of obtaining a job and living

independently is unfounded.[144] The District complied with the IDEA in

---

[143] *See* Docs. 207-23 at 1–5 and 226 at 57:6–16, 79:1–10, 165:19–167:13; Admin. Hrg. Tr. at 543–44, 554.

[144] The hearing officer found that the transition services provided during the 2011–12 school year were inadequate. Admin. Rec. No. 50 at 29–30. Based on record evidence of extensive transition services provided to C.S. that were focused on developing skills in the areas of employment, training, independent living, social, and community participation—areas that

32

administering age-appropriate transition assessments, developing measurable post-

secondary goals, and providing appropriate transition services.

## D. Parental Participation

Petitioners' last procedural claim asserts that the District violated 20 U.S.C.

§ 1415(m)(2) by failing to seek the appointment of McCarvel as C.S.'s "parent" at

the time C.S. reached the age of majority, thus violating McCarvel's rights of

parental participation and denying C.S. a FAPE during the 2012–13 school year.[145]

Section 1415(m)(2) provides:

> If, under State law, a child with a disability who has
> reached the age of majority under State law, who has not
> been determined to be incompetent, but who is determined
> not to have the ability to provide informed consent with
> respect to the educational program of the child, the State
> shall establish procedures for appointing the parent of the
> child, or if the parent is not available, another appropriate
> individual, to represent the educational interests of the
> child throughout the period of eligibility of the child under
> this subchapter.

As applied to this case, 20 U.S.C. § 1415(m)(2) directs that the State of

Montana[146] provide a procedure for the appointment of an educational

---

addressed C.S.'s unique transitional needs—the hearing officer's findings on this issue are not
deserving of deference.

[145] *See* Doc. 17 at 6–7.

[146] As used in 20 U.S.C. § 1415(m)(2), "State" is defined as "each of the 50 States, the
District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas." 20
U.S.C. § 1401(31) (2018).

representative for an adult student with a disability who cannot provide informed consent. When C.S. reached the age of majority on March 9, 2012,[147] "Montana law [had] not outline[d] a procedure for appointing a [parent] for an adult student with disabilities."[148] Absent a state-provided procedural mechanism to implement 20 U.S.C. § 1415(m)(2)'s directive, McCarvel has no cognizable claim against the District under this statutory provision.[149]

Under 20 U.S.C. § 1415(m)(1)(B), upon reaching majority on March 9, 2012,[150] "all other rights accorded to [C.S.'s] parents" transferred to him.[151] At that time, he had not been found to be an incompetent and no guardian had been appointed for him.[152] Moreover, Mary Jo Mahoney had been appointed his surrogate parent "in all decision-making processes concerning [C.S.'s] educational

---

[147] *See* Docs. 196 at 9 and 225 at 186:7–11.

[148] *In re C.S.*, 320 P.3d 981, 985 (Mont. 2014).

[149] *See Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 255 (5th Cir. 2017) (finding that a petitioner under the IDEA could not benefit from 20 U.S.C. § 1415(m)(2) since, "although the federal statute requires states to set up [a] procedure, Texas ha[d] not done so").

[150] *See* Docs. 196 at 9 and 225 at 186:7–11.

[151] The hearing officer found that C.S. "held all parental rights afforded under the DIEA since March 9, 2012." Admin. Rec. No. 50 at p. 4.

[152] *See* Doc. 213-10 at 2.

34

needs" on February 22, 2013,[153] and she remained in that capacity until December 15, 2014.[154]

McCarvel had no legal status as surrogate parent for C.S. or otherwise once he reached age 18 on March 9, 2012. No provisions of the IDEA imposed any affirmative obligation on the District to seek the appointment of McCarvel or anyone else to represent C.S.'s educational interests,[155] and for which Mary Jo Mahoney already had been appointed.[156] In addition, C.S. had repeatedly stated his desire to graduate in June 2013,[157] and he did so.[158] It was not until over a year later in December 2014 that any alteration of the status of Mary Jo Mahoney as C.S.'s lawfully appointed surrogate parent for educational purposes occurred.[159]

Moreover, the surrogate-parent-for-educational-purposes issue has been and remains ancillary to the core and determinative question before this Court of whether the District provided C.S. with a FAPE during the 2011–12 and 2012–13

---

[153] *See* Doc. 213-14 at 1.

[154] *See* Doc. 121-2 at 1–9.

[155] The Court does not reach and makes no decision on the question of whether it had capacity or jurisdiction to lawfully undertake to order: (1) ouster of Mary Jo Mahoney as surrogate parent; and (2) replacement of her with McCarvel as surrogate parent.

[156] *See* Doc. 213-14 at 1.

[157] *See* Doc. 207-22 at 9–10.

[158] *See* Docs. 196 at 9 and 207-25 at 9.

[159] *See* Doc. 121-2 at 1–9.

35

school years before he, as an adult, expressed his desire to leave school and exercised his prerogative to graduate.

## II. Substantive Claim

### A. Standard

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[160]

A court "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal."[161] Although the IDEA was enacted with "'ambitious'"[162] goals, the Supreme Court has been clear that it does not mandate that a school district provide a "potential-maximizing education."[163]

This articulated and Supreme Court-endorsed substantive standard also must be applied with a "focus on the particular child,"[164] since the "adequacy of a given IEP turns on the unique circumstances of the child for whom it was created."[165]

---

[160] *Endrew*, 137 S. Ct. at 999.

[161] *Endrew*, 137 S. Ct. at 999 (citation omitted).

[162] *Endrew*, 137 S. Ct. at 999 (quoting *Rowley*, 458 U.S. at 179).

[163] *Rowley*, 458 U.S. at 197 n.21.

[164] *Endrew*, 137 S. Ct. at 999.

[165] *Endrew*, 137 S. Ct. at 1001.

The IDEA recognizes "that the benefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between."[166] And as the Supreme Court in *Endrew* made clear, the "child's intellectual abilities and potential [are] among the most important circumstances to consider."[167]

Furthermore, a school district "*must aim to enable* [the] child to make progress," not guarantee progress.[168] A school district "does not *ipso facto*" violate its substantive obligation under the IDEA when a student makes only "negligible (or uneven) academic progress."[169] The IDEA only requires that a school district provide a "'basic floor of *opportunity*'" that is "individually designed to provide educational benefit."[170]

Courts must also avoid "'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'"[171] The Supreme Court has cautioned courts from "adopt[ing] the problematic role of

---

[166] *Rowley*, 458 U.S. at 202.

[167] *Downingtown*, 904 F.3d at 254 (citing *Endrew*, 137 S. Ct. at 999).

[168] *Endrew*, 137 S. Ct. at 999 (emphasis added).

[169] *J.B. by and through Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018).

[170] *Rowley*, 458 U.S. at 201 (quoting H.R.REP. No. 94–332, at 14 (1975)) (emphasis added).

[171] *Endrew*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206).

education policymaker [by] dictat[ing] which pedagogical methods a school district must consider and to what degree they must be incorporated on an individualized, case-by-case basis."[172] "When schools use their expertise to address each child's distinct educational needs," courts must "give their judgments appropriate deference,"[173] and "may not rely on hindsight to second-guess an educational program that was reasonable at the time."[174]

## B. Application

The record before the Court clearly supports the conclusion that the IEPs provided to C.S. were reasonably calculated to enable C.S. to make progress appropriate in light of his circumstances during the 2011–12 and 2012–13 school years. The District expended an extraordinary investment in time, talent, and resources in multiple good faith efforts to provide C.S. with a FAPE required by federal law.[175]

---

[172] *Renee J. as Next Friend of C.J. v. Houston Indep. Sch. Dist.*, 2019 WL 211216, *4 (5th Cir. Jan. 16, 2019) (citing *Endrew*, 137 S. Ct. at 992–93; *Rowley*, 458 U.S. at 207); *see also Carlson v. San Diego*, 380 F. App'x 595, 597 (9th Cir. 2010) (agreeing that questions of "'proper methodology'" should be left to the states) (citing *Rowley*, 458 U.S. at 208).

[173] *Downingtown*, 904 F.3d at 250 (citing *Endrew*, 137 S. Ct. at 1001–02).

[174] *Downingtown*, 904 F.3d at 255 (citing *Endrew*, 137 S. Ct. at 1001–02).

[175] *See, e.g.*, Doc. 226 and 227 (recording the multitude of ways C.S.'s special educators were dedicated to providing him with the best education possible).

38

The record shows that the 2011 IEP and 2013 IEP included all necessary

components as required by 20 U.S.C. § 1414(d)(1)(A)(i): (1) a statement of C.S.'s

"present levels of academic achievement and functional performance"

("PLAAFPs")[176]; (2) "a statement of measurable annual goals" designed to meet

C.S.'s unique needs[177]; (3) a description of how C.S.'s progress toward meeting his

annual goals will be measured and when periodic reports on C.S.'s progress will be

provided[178]; (4) "a statement of the special education and related services and

supplementary aids and services" to be provided to C.S., and a statement of

program modifications and supports for District personnel to be provided to

C.S.[179]; (5) an explanation of the extent to which C.S. would not participate in the

---

[176] 20 U.S.C. § 1414(d)(1)(A)(i)(I) (2018); *see* Docs. 207-6 at 3–5 (providing PLAAFPs for Math, Reading, Social/Emotional/Behavioral, and Written Expression) and 207-22 at 5–7 (providing PLAAFPs for Math, Reading, Self-Help/Independence, Social/Emotional/Behavioral, and Written Expression). The District's PLAAFPs are not inadequate for having varying degrees of specificity. The IDEA does not mandate that PLAAFPs be constructed in a certain form or based on a certain qualitative or quantitative measurement; it only requires that a statement be made regarding a student's present levels of achievement and the effect they have on the student's progress. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(I) (2018).

[177] 20 U.S.C. § 1414(d)(1)(A)(i)(II); *see* Docs. 207-6 at 3–5 (providing measurable annual goals for Math, Reading, Social/Emotional/Behavioral, and Written Expression) and 207-22 at 5–7 (providing measurable annual goals for Math, Reading, Self-Help/Independence, Social/Emotional/Behavioral, and Written Expression).

[178] 20 U.S.C. § 1414(d)(1)(A)(i)(III); *see* Docs. 207-6 at 3–5 (providing that measurable annual goals will be "measured by teacher observation and recording," and progress reports to be provided to parents "every six weeks") and 207-22 at 5–7 (providing that measurable annual goals will be "measured by teacher observation and recording," and progress reports to be provided to parents "every six weeks").

[179] 20 U.S.C. §§ 1414(d)(1)(A)(i)(IV), (VII); *see* Docs. 207-6 at 5–6 (providing 810 minutes per week in special education in the areas of Math, Reading, Written Expression, and

39

regular classroom[180]; (6) a statement of accommodations necessary to measure

C.S.'s academic achievement and functional performance on State and districtwide

assessments[181]; and (7) appropriate measurable post-secondary goals and transition

services.[182] The IDEA does not "require that additional information be included in

a child's IEP beyond what is explicitly required" in 20 U.S.C. §

1414(d)(1)(A)(i).[183]

---

Social/Emotional/Behavioral, 150 minutes per week in related services in the area of Transportation, and the following supplementary aids and services: "extended time, small group testing, shortened assignments/tests, 5 min timeout when needed, preferential seating, read outloud [*sic*] when necessary") and 207-22 at 7 (providing 1100 minutes per week in special education in the areas of Math, Reading, Written Expression, and Social/Emotional/Behavioral, 300 minutes per week in related services in the area of Transportation, and the following supplementary aids and services: "small group testing, extended time on assignments and tests, five minute timeout when needed in safe place determined by team, preferential seating, directions can be read alout [*sic*] when necessary, shortened/modified assignments/tests").

[180] 20 U.S.C. § 1414(d)(1)(A)(i)(V); *see* Docs. 207-6 at 5 ("Due to behaviors that impeded [C.S.'s] learning and the learning of his peers, [C.S.] does better in small group's [*sic*] within a restrictive environment.") and 207-22 at 7 ("[C.S] learns best in small/structured class room [*sic*] settings.").

[181] 20 U.S.C. § 1414(d)(1)(A)(i)(VI); *see* Docs. 207-6 at 6 (providing the following accommodations for statewide and districtwide assessments: "extended time, small group testing, shortened assignments/test, 5 min timeout when needed, preferential seating, read out loud when necessary") and 207-22 at 8 (providing the following accommodations for districtwide assessments: "small group testing, extended time, [and] can have directions read at any time").

[182] 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); *supra* pp. 28–33.

[183] 20 U.S.C. § 1414(d)(1)(A)(ii) (2018).

40

The claim of complete lack of academic progress asserted[184] is neither supported by the record,[185] nor is it the test by which educational programs made available to C.S. are to be evaluated. The question is whether the IEPs were reasonable, not whether they were ideal, form-perfect, or potential-maximizing. Furthermore, claims that the 2011 and 2013 IEPs were based on "flawed" evaluations,[186] failed to "develop C.S.'s skills in all areas of educational need,"[187] failed to "provide adequate transition services" or behavioral intervention plans,[188] and included inadequate "present levels of academic achievement" and measurable annual goals[189] are without merit. Reevaluations complied with procedures[190] and a wide array of special education services to address math, reading, and written

---

[184] *See* Doc. 17 at 11–12.

[185] Although academic progress is not essential to a finding that a FAPE was provided, the record indicates that C.S. made observable progress in several academic areas. *See* Admin. Hrg. Tr. at 554-66. By the end of the 2011–12 school year, some of C.S.' math skills had progressed from a third-grade level to between a fifth- and sixth-grade level. *See* Admin. Hrg. Tr. at 554–55, 559; *see also* Admin. Rec. No. 50 at p. 12 ("There was improvement in [C.S.'s] math [between October 4, 2011, and October 3, 2012]"). During this school year, teachers observed that his spelling, writing ability, comprehension, and ability to read, especially read out loud, had improved. *See* Admin. Hrg. Tr. at 557-59. C.S. also demonstrated observable academic progress in science, history, and art. *See* Admin. Hrg. Tr. at 555–56, 558–59. C.S.'s ability to collaborate even improved despite his social skills deficits. *See* Admin. Hrg. Tr. at 555–56.

[186] Doc. 17 at 10.

[187] Doc. 17 at 12.

[188] Doc. 17 at 11, 13.

[189] Doc. 17 at 10, 12.

[190] *Supra* pp. 15–23.

41

expression deficiencies were provided.[191] Individualized behavioral programming

to address behavioral issues were implemented[192] and transition services were

conducted.[193] Levels of academic achievement and annual goals were appropriately

measured and designed.[194]

Moreover, C.S.'s repeated and extreme inappropriate behavior and

disruptive conduct greatly exacerbated the difficulties the District faced. The

record reveals in detail the outsized toll this behavior had on both his teachers and

peers,[195] resulting in frequent (sometimes daily) class evacuations due to sexually

inappropriate or aggressive behavior[196] and repeated acts of actual or threatened

---

[191] *See* Docs. 207-6 at 5, 207-22 at 7, and 226 at 113:9–16. The District employed a wide array of instructional methods to address C.S.'s academic deficiencies in math, reading, and written expression, including the "Adventures in Language" curriculum, "Everyday Mathematics", "Success Maker", "STAR Math", "Accelerated Math", the "Reading Mastery" curriculum, computer-based programs, concept mapping, picture descriptions, chunking, peer modeling, and peer tutoring. *See* Doc. 226 at 60:6–20. Additionally, C.S. was also provided daily instruction in science, history, and art throughout the 2011–12 and 2012–13 school years. *See* Admin. Hrg. Tr. at 543–53, 559.

[192] *Supra* pp. 23–28.

[193] *Supra* pp. 28–33.

[194] *See* Docs. 207-6 at 3–5 and 207-22 at 5–7.

[195] *See* Docs. 207-4 at 1–7 (describing instances of physical violence and threats of physical harm), 207-8 at 1–54, and 207-9 at 1–90 (collectively recording unwanted touching of peers and staff, sexual behaviors in class, profane language, and other disruptive behaviors).

[196] *See* Docs. 207-8 at 1–54 (recording frequent sexual behaviors in class), 207-29 at 1–90 (recording frequent sexual behaviors, sometimes directed towards others, and aggressive and unsafe behaviors that required classroom evacuations), and 226 at 54:21–55:11, 142:4–146:8 (describing daily occurrences of sexually inappropriate behaviors that required classroom evacuations)

violence.[197] It is simply unwarranted to fault the District or C.S.'s teachers for the results or outcomes of the, in many instances, inappropriate, disruptive, and violent conduct of C.S. himself.

## Conclusion

Based on the record before the Court and the reasons stated above,

ORDERED:

1. The hearing officer's administrative decision is REVERSED and VACATED.

2. The District provided C.S. with a FAPE during the 2011–12 and 2012–13 school years.

3. The District met its procedural and substantive duties to C.S. under the IDEA.

4. All claims asserted by Petitioners are dismissed.

5. The clerk is directed to enter judgment for the District and against Petitioners on all claims and close the case.

DATED this 28th day of January, 2019.

SAM E. HADDON
United States District Judge

---

[197] *See* Docs. 207-4 at 1–7, 207-8 at 2, 4, 12, 33–35, 42, 207-29 at 7, 8, 11, 12, 33, 35, 38–40, 47, 59, 66, 67, 70, 73–74, 86, and 226 at 54:21–56:15, 146:9–149:5 (collectively describing threats of physical violence, including several instances of threatening to kill teachers and hitting, stabbing, and punching teachers and peers).